Thank you, Your Honor. Well, one thing is certain about the jurisprudence around Section 2B1.1b is that bank fraud with multiple victims has become increasingly popular in the United States. Our circuit has issued two decisions addressing it. FOM and Armstead and the 6th, 5th, 30th, 11th, and 1st have all had recent decisions determining how to do about the victims and how to assess reimbursement and restitution surrounding that victim count. The 2B1.1b, the sentencing commission definitely considered it to be end of the game, sort of a net loss type thing just because I think they used the past tense in the pecuniary harm that resulted from the offense. Tell us what bothers you so the people in the courtroom know what this case is about. My client, Tony Barnes, was one of those individuals recruited from the streets of L.A. to go around the country and take assumed identities and withdraw money from banks around the country. It just so happens that he was apprehended in Montana. They were very quick to get him, weren't they? Pardon? They were pretty quick to get him in Montana. They jumped on him quick. I mean, the reason being is because they had been to so many institutions around the country, virtually all of which have video, they put out fraud alerts. And so when they showed up at the next Wells Fargo branch or somewhere, they were quick to point out. And as a practical matter, of course, Tony's an African-American from South Central L.A. Well, not too quick. He got away with $145,000 unless he was... Not in Montana, he didn't. He never actually made a transaction in Montana that worked without getting caught. So he did plenty of action in lots of other places, however. So the issue on appeal is how to... Where was he finally caught? He was caught near Dillon, Montana. Dillon. Which is just south of Butte. Rough country. There's a... It wasn't hard for the Montana Highway Patrol to find three African-Americans in a Jeep. In any case, the issue on appeal that I think this court has to look at is to balance FOM on one hand and Armstead on the other. So what's the issue? What happens when we don't know if the loss can be determined pecuniary? So in other words, was it fast enough? Was the reimbursement fast enough so that there's no pecuniary harm in order to fit the guideline, to fit the definition of being a victim under the guideline? So here, we don't know, under the Armstead standard, whether or not the reimbursement was fast enough to constitute pecuniary harm or not. What Judge Malloy decided was, oh, this is silly. We're just going to assume that there was harm, and we're going to make an assessment of what a typical amount of harm ought to be. And so he decided it ought to be $400. We didn't quite assume. He took evidence as to, from several persons who had been victims, as to how much time they'd spent getting their identity back, the gasoline they'd spent in getting to the courthouse, the time that they'd lost from work. And he added up some numbers of different people, and he said, I'm going to use this as a basis for a, quote, reasonable estimate of a loss. I'm quoting from Guidelines 2B1.1 comment in 3C. Now, surely if a jury had done this in assessing damages, we wouldn't spend five minutes affirming. Why shouldn't we do that with Judge Malloy? You know, the difference here is actually, in the case of Barnes, he didn't have testimony in that regard. What he had was an FBI agent who offered testimony based upon hearsay within hearsay that he acknowledged he had no indicia of reliability about. And so for Barnes, there was actually none of that specific. Are you saying is that none of Barnes' victims testified? No. No, you're not saying that? Yes, I am saying that none testified. Yeah. But let me ask you this. Under this Restitution Act, Section B3B, it says, this section shall not apply in the case of an offense described in paragraph, if the court finds from facts on the record that, determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. And isn't that kind of touching what's going on here? And I don't know why we're even involved in this because the chances of your client having to pay any restitution are almost nonexistent. I mean, how's he going to pay it? $200 a month, he's got, what, like $133,000 or $140,000 to pay off, and he's in prison. It is a practical matter. The restitution to the banking institutions will probably come slowly. But they're never going to get their money back. True enough. Unless he goes back to work as a walker. Let me ask you one question. Notice that when you look at the Ninth Circuit cases, there's stress on the unique position of the sentencing judge in making judgments like this. And it does seem to me the judge is always in a better position than we are. Well, what happened here is that FOM was decided right before Barnes got sentenced and Armstead was decided right after. So Armstead was the case that brought in this thing, the whole notion that you have to have, if you have pecuniary harm, it only comes upon when the reimbursement isn't immediate or within a short amount of time. So Judge Malloy didn't have the advantage at sentencing of addressing the notion of what this court decided in Armstead. And that's kind of what the issue is on appeal. I urged Judge Malloy to use a different accounting at sentencing to try to have Barnes fit under so he wouldn't have the two-level enhancement for having a victim in a loss amount greater than $200,000. But he didn't buy it. Yeah. But I think that my accounting was probably more accurate. Yeah. You want to save some time? I certainly do. One of the problems we're faced with is that 30 years ago the legislative branch adopted this abomination called sentencing guidelines and stripped the district judges of their discretion for all practical purposes and locked them in to a structure that is almost as complicated as the Internal Revenue Code. And so he made the call and did the best he could, and that decision properly belongs with the district court. So you've got my feelings on this. All right. You know, the First Circuit just a month ago in Stepanian echoed those sentiments exactly, which was this is in the district court's purview. You should let them go. Unfortunately, that's not the current jurisprudence in this circuit. So with that, I'll reserve my time for a short rebuttal. Go ahead. Good morning. May it please the Court. I'm Ryan Archer on behalf of the United States. I think the moral to this case is don't commit identity theft in Butte, Montana, because the bank manager in Butte, Montana actually, when she spotted Mr. Barnes enter and leave the bank, got in her own personal vehicle and chased him down on the freeway, got his license plate number and reported it to the cops. And that's why they were ultimately stopped. So Butte, Montana is not the place to commit this kind of crime. Why did they cash the check to begin with? Why did they cash the check? They didn't realize at that point, they didn't pick up the fraud alert until after, as he was engaged in the transaction. That's a little bank. Don't they know their customers? Well, Butte, Montana, you still get a lot of people coming in. How much was the check?  Yeah, they like to cash the big checks, you know. But the little checks, they require a lot of identification. Correct, Your Honor. Because they don't want to lose the big customers, you know. Especially when they're just passing through. Yeah. I would like to make a distinction with my opposing counsel. He had indicated the Armstead standard, and he was talking about the time that it took to reimburse the victims in this case. That standard was also set down in FAM. Basically, in order to have an account holder who's been reimbursed by a bank be counted as a victim under the guidelines, there's two separate ways. Either their money is gone for an appreciable amount of time, and therefore they can become victims by having actual loss just because their money was gone for so long. Or secondly, they can have collateral expenses, such as time away from work, gas to drive down to the bank, and things of that nature. Judge Malloy had evidence before him of how long the loss occurred for each victim, but he specifically relied on the second theory, which is the collateral expense theory. He did that because that is essentially the evidence that the government was putting in at the time of sentencing. All of these victims, and I'm going to go apart from, although we had testimony specific to certain victims and their allegations, I want to depart from that because what I think... Well, what's the point of doing that? How many victims do you have, 31? 31 victims. 31 victims, and there's not a chance in whatever place you want to designate for this person to pay any of that back. Correct, Your Honor. So why go through? Well, there's two separate issues. There's a restitution issue, which, as you point out, is probably not going to get paid back. But the bigger issue before the court was for guideline calculation purposes, determining the loss amount and determining whether these people are, in fact, victims. And, Judge Pragerson, I think you hit on a good point. Well, there's no issue and no real problem on establishing how the guidelines, which are unconstitutional, apply. We have a system where we're supposed to apply unconstitutional guidelines. Well, Your Honor, I believe the state... Am I right? I'm not going to go that far with you, Your Honor. I believe Cardi sets down essentially what the process is, that we still do have to come up with a guideline calculation that has to be a correct calculation for the procedural aspects of sentencing. That's because we employ now a lot of probation officers to do these computations, and it's part of our full employment policy. Maybe it's part of the stimulus, Your Honor. I'm not quite sure. But essentially we need to get to their... Are these folks who have put more money into circulation or trying to? Let me ask you this. Do you agree with your esteemed colleague that the jurisprudence in the Ninth Circuit requires a particularized individual calculation of loss for NBRA purposes? Individual, as you mean each victim comes in and each victim has a different loss figure. Right. If one has $35 and the other one has $162, you can only add $35 to $162. You can't average, you can't take in any evidence to arrive at an average collateral damage issue. No, Your Honor. I believe you have to arrive at an average. And that was the government's position. What about the jurisprudence? Do you agree with that? Is it the case that says what we should do in this particular circumstance or are we given flexibility by the terms of the statute to make a reasonable calculation? I think it's the terms of the statute. Ultimately, the question before this Court... So your point is there is no Ninth Circuit court case which precisely holds one way or the other? Correct. All right. We are the first case here trying to interpret FAM. What statute are you pointing to? 2B1.1, basically the sentencing guideline and the case law that says that you need to arrive at a reasonable estimation of loss. That is the central question before this Court. What is a reasonable estimation of loss as far as how much in collateral expenses these account holders have? We're not dealing with the guidelines when we're dealing with restitution, are we? Well, the guidelines interpreted by FAM essentially says what you have is actual loss here. When you go out and you drive to your bank to fix your account, you buy new checks, that is counted as actual loss under the guidelines and therefore as actual loss, then when we get to restitution purposes, you're going to include that actual loss in the restitution calculation as well. But what about that section I read? Yes, Your Honor, that section... Isn't that cut in there? This section shall not apply. Court finds that determining the complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. Don't you have that here? Yes, Your Honor. I believe that's exactly what we have here. Why doesn't that end the matter? That should end the matter, Your Honor. All right. And the problem with FAM and Armstead is that... Did Judge Malloy find this computation so complex that he couldn't make it? Your Honor, essentially he did not make that specific finding. Implicit. It was implicit, correct. The way this came down was one of the co-defendants was sentenced a week before Mr. Barnes was sentenced. At that hearing, we contemplated an additional 90 days after the sentencing hearing to prove up restitution, as Judge Bea was suggesting, person by person, dollar by dollar. By the time we got to Mr. Barnes' hearing, it became apparent that the numbers were all over the board. We had a heart surgeon coming in claiming $348 an hour, and that simply would not be a fair assessment of the time it takes to fix a person's identity. And so it became clear to Judge Malloy by the second hearing that what we have to do here in a situation like this is come to a reasonable estimation of the loss  not necessarily each specific victim's claim. And my opposing counsel here comments that we didn't have all 31 of the victims coming in and making specific claims. But what Judge Malloy did is he relied on that general testimony that said, well, look here, you've got so many hours that it's going to take to fix this problem. You've got costs to buy new checks. You have costs to the bank. The only real way to come to a reasonable conclusion is to pick an average based on the evidence before the court at that time and then make the determination as far as loss and restitution on those numbers. Well, actually, the bank ought to pay for the new checks. The bank charged for new checks, and the bank made the mistake of cashing the phony checks. So the bank makes money either way. Well, the bank also is the biggest loser in the case, too, because they reimbursed the loss, so they're stuck with the bulk of the restitution. And the testimony before the district court was that as a general practice, the bank did not reimburse them for the checks or the non-sufficient funds or the lost interest, but they did reimburse them for the lost money in the account. All right, thank you. Thank you. Very quickly, judges. The testimony that Ryan's talking about was taken at a hearing from a different defendant a week prior that I didn't have a chance to cross-examine, and I never got a chance to work on that guy. But what this court held in FOMM was that it may not be necessary to produce evidence for every victim. So what this circuit ruled is, yeah, you can do general things. But then after Barnes was sentenced, this circuit came out with another ruling in Armstead that said, but, you know, it may not be pecuniary harm if the reimbursement is quick enough. And that's the rub. And so, you know, Ryan's right. We're in a situation now where we have kind of two balls up in the air and we haven't quite figured out what to do with them. And then repeat again. What do you say is the rub? We have two balls up in the air. One case says, well, you can generalize harm if you want to. So the district court can say, okay, I don't have to take specific evidence. I can just do a general ballpark thing and I'm okay. Or after Barnes was sentenced, this circuit also said, well, it's not pecuniary harm if the reimbursement is quick enough. But we don't know. Why isn't it one thing is harm and the other is restitution of the harm? Restitution of the harm becomes determinant of whether there is harm? Well, there's no restitution if there's nothing to pay back. No, but I thought you were saying that the immediacy with which restitution is made determines whether or not there was harm. Whether there's pecuniary harm. With a pecuniary, that doesn't make any sense to me. Does it make sense to you? I didn't write the opinion, Your Honor. All right. All right. All right. All right. All right. All right. All right. But unless you have any more questions, I – No, thank you. All right. Thank you, Your Honors. All right. That is submitted.
judges: Pregerson, Noonan, Bea